AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

FILED

JUL 1 0 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Samsung Galaxy J7 Prime with IMEI<br>#357713080787937 | )<br>)<br>)<br>)<br>)<br>)  Case No. |

19MJ2881

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 31 USC 5332 | Bulk Cash Smuggling |

The application is based on these facts:

See attached Affidavit of Special Agent William Thompson

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent William Thompson, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/10/19

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, William Thompson, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant in furtherance of a bulk cash smuggling investigation conducted by Department of Homeland Security, Homeland Security Investigations Special Agents for the following target properties:

a. One cellular telephone seized on May 20, 2019, from Julio Cesar MORENO-Ortiz ("MORENO"), following a vehicle stop by Border Patrol conducted in Interstate 8 near the Pine Valley checkpoint. The cellular telephone is a Samsung Galaxy J7 Prime with IMEI #357713080787937 ("TARGET TELEPHONE #1"); and,

b. One cellular telephone seized on May 20, 2019, from Wendy Karen GUEVARA-Hidalgo ("GUEVARA"), following a vehicle stop by Border Patrol conducted in Interstate 8 near the Pine Valley checkpoint. The cellular telephone is an Apple iPhone with IMEI #357275095556632 ("TARGET TELEPHONE #2");

(collectively, the TARGET TELEPHONES"). The TARGET TELEPHONES were seized from MORENO and GUEVARA, when they were pulled over by Border Patrol driving a 2007 Honda Element concealing approximately $104,377.00 of United States currency. I believe that the TARGET TELEPHONES were used by MORENO, GUEVARA, and their co-conspirators during a bulk cash smuggling event on May 20, 2019. Both MORENO and GUEVARA have been charged with Bulk Cash Smuggling in violation of Title 31, United States Code sections 5332 in the Southern District of California in case number 19-cr-2026-JAH.

2.     Probable cause exists to believe that the TARGET TELEPHONES contains evidence relating to violations of Title 31, United States Code Sections 5332 (Bulk Cash Smuggling). Both TARGET TELEPHONES are currently in the possession of the Department of Homeland Security, U.S. Border Patrol, Chula Vista Border Patrol Station, 3752 Beyer Boulevard, Building 24, Chula Vista, CA 92173.

3.     Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B will be found in the item to be searched as described in Attachment A.  These items may be or lead to: (1) evidence of the existence of bulk cash smuggling in violation of Title 31, United States Code Section 5332, and (2) property designed or intended for use, or which is or has been used as a means of, committing criminal offenses.

## TRAINING AND EXPERIENCE

4.     I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI). I have been employed by HSI (formerly the United States Customs Service) as a Special Agent since December 2001 and I am currently assigned to the HSI San Diego office and the Asset Identification and Removal Group (AIRG). My duties within the AIRG group include supporting HSI investigations in the identification and seizure of assets associated with criminal activity, including drug trafficking, bulk cash smuggling and money laundering, and to initiating civil and criminal forfeiture actions against these assets.

5.     As an HSI Special Agent assigned to the San Diego office, and a cross-designee of the United States Drug Enforcement Administration (DEA), my duties also include investigation of criminal violations relating to the smuggling and transportation of controlled substances, and enforcement of the provisions of the Federal Controlled Substances Act, otherwise known as Title 21 of the United States Code (USC).

AFFIDAVIT IN SUPPORT OF APPLICATION                    2
FOR SEARCH WARRANT

6.     During my tenure as an HSI Special Agent, I have participated in numerous narcotics related investigations. During these investigations, I have directed investigative activities as the primary case agent, observed and recorded the movements and activities of traffickers as a surveillance agent, participated in the execution of search warrants, initiated and executed numerous arrests, and interviewed defendants, witnesses and informants regarding the illegal importation and trafficking of controlled substances. Through these investigative activities, I have gained knowledge and insight into the operational habits of narcotics as well as currency smugglers, with emphasis on those who attempt to conduct these illegal activities through San Diego international ports of entry (POEs).

7.     Through my training, investigations, and conversations with other agents and law enforcement personnel, I have become aware that it is a common practice for narcotics and currency smugglers to work in concert with other individuals through the utilization of cellular telephones, pagers, portable radios and GPS devices. Utilization of these electronic devices allows smugglers and co-conspirators to further their criminal activities. This is particularly true in cases involving the smuggling of large amounts of narcotics or currency. Typically, load drivers smuggling controlled substances or currency are in telephonic contact with co-conspirators immediately prior to, during and following the crossing of the load through the international POE, at which time they receive instructions on how to cross and where and when to deliver the load. Narcotics and currency smugglers and their organizations use cellular, digital, and satellite telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of placed calls.

8.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of bulk cash smuggling

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

3

investigations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

9.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in bulk cash smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.  Money smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, WhatsApp and other texting applications, the internet, video, social networking sites, and voice messages;

b.  Money smugglers will use WhatsApp and other encrypted texting applications on cellular telephones to communicate because they believe that these services insulate their communications from law enforcement;

c.  Money smugglers will use cellular telephones because they are able to actively monitor the progress of their valuable cargo while the conveyance is in transit.

d.  Money smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their valuable cargo will arrive at predetermined locations.

e.  Money smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their valuable cargo.

f.  Money smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity including the presence and location of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

g.  Money smugglers will use cellular telephones to communicate with each other regarding payment and other financial arrangements relating to the transportation of their valuable cargo.

10.     Based upon my training and experience, and consultations with law enforcement officers experienced in cash smuggling investigations, and all the facts and

opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular telephones yields evidence:

      a.    tending to identify attempts to transport currency from the United States into Mexico;

      b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of currency from the United States into Mexico;

      c.    tending to identify payment, payment methods, or other monetary transactions relating to exporting currency from the United States into Mexico;

      d.    tending to identify co-conspirators, criminal associates, or others involved in smuggling currency from the United States into Mexico;

      e.    relating to the purchase of vehicles to export currency from the United States into Mexico;

      f.    tending to identify travel to or presence at locations involved in the smuggling currency from the United States into Mexico, such as stash houses, load houses, or delivery points;

      g.    tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

1           h.    tending to place in context, identify the creator or recipient of, or

2    establish the time of creation or receipt of communications, records, or data involved in the

3    activities described above.

4         11.    The facts set forth in this affidavit are based on my own personal knowledge;

5    knowledge obtained from other individuals during my participation in this investigation,

6    including other law enforcement officers; interviews; my review of documents related to

7    this investigation; communications with others who have personal knowledge of the events

8    and circumstances described herein; conversations with other agents experienced in

9    controlled substance investigations, and information gained through my training and

10   experience.  All the dates, times, and amounts listed in this affidavit are approximate.

11   Because this affidavit is submitted for the limited purpose of establishing probable cause

12   in support of the application for search warrants, it does not set forth each and every fact

13   that I or others have learned during the course of this investigation.

14                          **FACTS SUPPORTING PROBABLE CAUSE**

15        12.    On May 20, 2019, at approximately 12:05 p.m., Border Patrol Agents

16   ("BPAs") encountered a 2007 Honda Element bearing Mexican license plate U85NRF1.

17   The driver of the vehicle, later identified as MORENO, was driving westbound on

18   Interstate 8 near the Pine Valley checkpoint. As MORENO approached the BPAs' position,

19   MORENO abruptly slowed down and moved lanes as if to blend in with other traffic. BPAs

20   observed that the vehicle was bouncing as if it contained something heavy. The BPAs

21   began to follow MORENO.

22        13.    As the BPAs followed MORENO, they observed as MORENO repetitively

23   change lanes and speed. Record checks for the vehicle revealed the vehicle last entered into

24   the United States from Mexico at 12:07 a.m. As BPAs pulled near MORENO, they noticed

25   as MORENO frequently looked through his side and rearview mirrors. MORENO then

26   substantially increased his speed. The BPAs conducted a vehicle stop.

27

28   AFFIDAVIT IN SUPPORT OF APPLICATION      6
     FOR SEARCH WARRANT

14.     The BPAs approached the vehicle and conducted an immigration inspection. Both MORENO and the front passenger, identified as GUEVARA, stated they were citizens of Mexico. The BPAs asked for their Visas, but GUEVARA's hands shook uncontrollably. GUEVARA told the BPAs that she was cold. The BPAs asked from where MORENO and GUEVARA were traveling, and they both stated Yuma, Arizona. The BPAs then asked they last time they entered the United States, but both MORENO and GUEVARA simultaneously gave different answers. BPAs asked MORENO who the vehicle belonged and their intended destination. MORENO replied that it was his vehicle and that they were heading to Tijuana, Mexico.

15.     After a request from BPAs, MORENO gave consent for a canine to search the vehicle. The canine alerted to the gear shifter area.

16.     BPAs began to search the vehicle. They found a non-factory screw on the plastic cover to the center console. They pulled the center console back and observed multiple bundles of United States currency. The BPAs took MORENO, GUEVARA, and the vehicle to the checkpoint to search. MORENO and GUEVARA were placed under arrest. TARGET TELEPHONE #1 was seized pursuant to MORENO's arrest, and TARGET TELEPHONE #2 was seized pursuant to GUEVARA's arrest.

17.     BPAs asked GUEVARA to remove every item from her pockets. GUEVARA removed a bundle of cash and a handful rubber bands from her trouser pockets. The bundle of cash that GUEVARA removed from her trouser was identical to the bundles discovered in the vehicles' center console. In addition, the rubber bands were exactly the same color and size as the ones were used to wrap the bundles that were discovered inside the center console.

18.     A total of 53 bundles were removed from the vehicle's center console and gear shift console. The bundles totaled $102,998.00. GUEVARA also had $379.00 in her purse, along with 5,760 Mexican pesos. A search of GUEVARA's purse revealed three

AFFIDAVIT IN SUPPORT OF APPLICATION            7
FOR SEARCH WARRANT

1  small pieces of paper with 10,000 written on them and more rubber bands. These small

2  pieces of paper and rubber bands were identical to some of the small pieces of paper and

3  rubber bands that were used on the bundles of currency.

4    19.    MORENO elected to waive his *Miranda* rights and make a statement.

5  MORENO stated his wife told him it was over one hundred thousand dollars. MORENO

6  stated he was the one who hid the money, and that he was instructed to take the money to

7  Tijuana, Mexico. MORENO stated that the point of contact was his wife. MORENO stated

8  they were going to get paid $2,000 USD for transporting the money to Tijuana. MORENO

9  stated they did not have a specific place for the delivery of the money and that they would

10  be contacted once they cross into Tijuana for a meeting. MORENO stated that his wife is

11  the person that collects the money and that he just drives. MORENO stated they have

12  transported money three times. MORENO stated that in a previous occasion they

13  transported approximately $20,000 USD and in another occasion it was approximately

14  $30,000. MORENO stated they would always get paid the same amount of money

15  ($2,000).

16    20.    GUEVARA also waived her *Miranda* rights. When asked about the money in

17  the center console of the car, GUEVARA stated that she did not know how it got into her

18  vehicle. GUEVARA stated that one time she asked about crossing money into the United

19  States and learned that it was illegal to cross more than $10,000 without declaring it.

20    21.    Based upon my experience and investigation in this case, I believe that

21  MORENO, GUEVARA, as well as other persons as yet known, were involved in an on-

22  going conspiracy to smuggle United States currency from the United States into Mexico.

23  Further, based on my investigation of bulk cash smuggling conspiracies, telephone contact

24  with smugglers can begin months or weeks before the event to plan and coordinate

25  smuggling events. Communications can then continue through the time a co-conspirator is

26  arrested, particularly if a co-conspirator is not aware of the arrest. Here, border crossing

27

28

1   records indicate both MORENO and GUEVARA crossed into the United States in the

2   vehicle on multiple occasions beginning on January 2, 2019. Therefore, I respectfully

3   request permission to search TARGET TELEPHONES for data beginning on December 2,

4   2018, up to and including this arrest date of May 20, 2019.

5       22.    Based on my experience investigating narcotics smugglers, I also believe that

6   MORENO and GUEVARA may have used the TARGET TELEPHONES to coordinate

7   with co-conspirators regarding the smuggling of United States currency, and to otherwise

8   further this conspiracy both inside and outside the United States.  I also know that recent

9   calls made and received, telephone numbers, contact names, electronic mail (email)

10   addresses, appointment dates, text messages, messages sent via texting applications such

11   as WhatsApp, email messages, messages and posts from social networking sites like

12   Facebook, photographs, videos, and other digital information can be stored in the memory

13   of cellular telephones which identify other persons involved in money smuggling activities.

14       23.    Based upon my experience and training, consultation with other law

15   enforcement officers experienced in bulk cash smuggling investigations, and the facts and

16   opinions set forth in this affidavit, I believe that information relevant to the money

17   smuggling activities of MORENO, GUEVARA and their co-conspirators are stored in the

18   memory of the cellular telephone described herein. Because the TARGET TELEPHONES

19   have been in the custody of Border Patrol since the date of arrest, I believe that this

20   information continues to be stored on the TARGET TELEPHONES.

21   **SEARCH METHODOLOGY**

22       24.    It is not possible to determine, merely by knowing the cellular telephone's

23   make, model and serial number, the nature and types of services to which the device is

24   subscribed and the nature of the data stored on the device. Cellular devices today can be

25   simple cellular telephones and text message devices, can include cameras, can serve as

26   personal digital assistants and have functions such as calendars and full address books and

27

28   AFFIDAVIT IN SUPPORT OF APPLICATION      9
    FOR SEARCH WARRANT

can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

//

//

AFFIDAVIT IN SUPPORT OF APPLICATION   10
FOR SEARCH WARRANT

**CONCLUSION**

27.   Based on all of the facts and circumstances described above, there is probable cause to believe that MORENO and GUEVARA used the TARGET TELEPHONES to facilitate the offenses of importing distributing methamphetamine. The TARGET TELEPHONES were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence and instrumentalities of violations of Title 31, United States Code, Section 5332.

28.   There is also probable cause to believe that evidence and instrumentalities of illegal activity committed by MORENO and GUEVARA continues to exist on the TARGET TELEPHONES.

29.   Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein).   Therefore, I respectfully request that the Court issue a warrant authorizing me or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

WILLIAM THOMPSON
HSI Special Agent

Subscribed and sworn to before me this 10 day of July, 2019.

HON. WILLIAM V. GALLO
United States Magistrate Judge

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

11

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

Samsung Galaxy J7 Prime with IMEI #357713080787937 (Target Telephone #1 ) currently in the possession of the Department of Homeland Security, U.S. Border Patrol, Chula Vista Border Patrol Station, 3752 Beyer Boulevard, Building 24, Chula Vista, CA 92173.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the Subject Telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Subject Telephone.  The seizure and search of the Subject Telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Telephone #1 will be electronic records, communications, and data such as emails, text messages, messages from text messaging applications like WhatsApp, messages and posts from social networking sites like Facebook, photographs, audio files, videos, and location data, for the period of December 2, 2018, up to and including May 20, 2019:

a.   tending to identify attempts to smuggle United States currency from the United States into Mexico;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of United States currency from the United States into Mexico;

c.   tending to identify payment, payment methods, or other monetary transactions relating exporting United States currency from the United States into Mexico;

d.   tending to identify co-conspirators, criminal associates, or others involved in smuggling United States currency from the United States into Mexico;

e.   relating to the purchase of vehicles to export United States currency from the United States into Mexico;

f.   tending to identify travel to or presence at locations involved in the smuggling of United States currency from the United States into Mexico, such as stash houses, load houses, or delivery points;

g.   tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

h.   tending to place in context, identify the creator or recipient of, or establish the

time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 31, United States Code, Section 5332.**

The seizure and search of the cellular phone(s) shall follow the procedures outlined in the supporting affidavit.   Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phone(s) may be searched for the evidence above.